Antonia **MIRAMONTES,** Appellant,

v.

The **STATE** of Texas, Appellee.

No. 08–03–00441–CR.

Court of Appeals of Texas, El Paso.

Aug. 31, 2005.

M. Clara Hernandez, El Paso County Public Defender, El Paso, Penny Lee Andersen, San Antonio, for appellant.

Jaime E. Esparza, El Paso, John L. Davis, for appellee.

Before BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

DAVID WELLINGTON CHEW, Justice.

This is an appeal from a conviction for the offense of unlawful possession of certain chemicals with the intent to manufacture a controlled substance, methamphetamine. After a jury trial, Appellant was sentenced to 10 year's confinement in the Institutional Division of Texas Department of Criminal Justice. On appeal, Appellant raises five issues. In Issues One and Two, she challenges the legal and factual sufficiency of the evidence. In Issue Three, she challenges the admission of extraneous offenses without proper notice. In Issue Four, she contends that this extraneous evidence was more prejudicial than probative, thus denying her a right to a fair trial. In Issue Five, she complains of a jury charge error. We affirm.

Appellant's trial began on September 9, 2003. At trial, the State's first witness was El Paso Police Department Detective Jose Candelaria. The State established that he had extensive training in narcotics, including attending a clandestine laboratory school, classified interdiction classes, and observing indoor marijuana groves. As part of his training, the detective learned how to make methamphetamine. He provided extensive explanation on the chemicals necessary to make methamphetamine and indicated that through his training, he is able to recognize the smell of a methamphetamine lab which he described as a very chemical like, pungent odor. He also testified that he had been to fifteen methamphetamine labs or suspected labs in El Paso. In all these places, he noticed the signature smell of a methamphetamine lab.

On August 16, 2002, he was part of a team that executed a no-knock search warrant on the residence located at 804 Lomita in El Paso County. He testified that there were about twelve to fifteen agents present, including members of the United States Drug Enforcement Agency (DEA). Detective Candelaria testified that the DEA agents entered the house first, and by the time he entered the house, the subjects inside the house, Appellant, Antonio Banda, and Myra Gonzalez, had already been handcuffed and secured by the DEA agents. He then proceeded to tour the house, searching for any type of narcotic evidence, or evidence that would indicate the presence of a methamphetamine lab. He was looking for chemicals like red phosphorus, iodine, and any kind of denatured alcohol with Drano, Red Devil, Sudafed tablets or blister packs, glassware, and finished products.

In the kitchen, he observed yellowish, almost orange stains which he believed were iodine stains. He also discovered a coffee filter with a reddish powder in it, which he believed was red phosphorus. A generator was also found in the kitchen trash, as well as a gram scales and denatured alcohol. In the living room, he found a tincture of iodine.

In Ms. Gonzalez's room, a pipe and two small baggies that appeared to contain methamphetamine, and some unknown liquids were found. Additionally, a powder

found in Myra's bedroom turned out not to be methamphetamine. In another bedroom, a Coleman fuel tank was found. In bedroom three, iodine crystals, two other unknown liquids, coffee filters, a heating element, two bags and a pipe, a burner, tubing, and a funnel were found. Red Devil lye was found in the bathroom. He also found a bucket of discarded match books, which appeared to have the striker plates missing from them, which he testified in his experience the striker plates are used to extract the red phosphorus. He also found a water bill addressed to the Appellant and to the address of the residence.

During cross-examination, Detective Candelaria testified that no evidence was found in the Appellant's bedroom. He further testified that Appellant was cooperative with them and did not try to run. He testified that Red Devil lye is used to unclog drains and agreed with defense counsel that a lot of people own this product. He continued to provide testimony regarding the list of the State's exhibits and stated that these things were common household items that could be bought at a store and none of which were illegal to own. On re-direct examination, Detective Candelaria indicated that he noticed a chemical smell, a pungent smell once he was inside the house. On re-cross examination, Detective Candelaria testified that he did not include this in his report, although he agreed with defense counsel that this would be important information to place in the report.

Next to testify was Phillip Austin Land, who at the time the search occurred was a special agent with the DEA. Special Agent Land testified that he had been sent to clandestine laboratory school. He also testified that he was sent to a training in Quantico, VA where he received training as to the precursors and chemicals neces-

sary to make methamphetamine. Special Agent Land has also received information regarding the life-style and the process used to make methamphetamine from talking to narcotics violators. He indicated that these individuals usually stay awake all hours of the day and night and that they are usually of a lesser weight than normal, their eyes are red and bloodshot, and their fingertips have a gray or yellowish stain that is difficult to remove.

Special Agent Land testified that on August 16, 2002, when he assisted in the execution of the search warrant on the residence at 804 Lomita, the Appellant was found getting out of bed; she was addressed immediately and was then placed on the ground and handcuffed. He testified two other individuals were arrested in the kitchen area. He indicated that the male subject appeared to be trying to get rid of stuff in the kitchen sink. By the kitchen sink, he observed a red substance, which based on his experience and training, he believed to be red phosphorous. There were also stains all over the kitchen wall. There was another substance which he believed, based on his experience and training, was iodine. He also testified that he noticed a distinct smell in the house, which he recognized as a smell similar to that found in other methamphetamine or clandestine labs. Special Agent Land also omitted this information from his report and agreed with counsel that this would be important information to include in the report. Special Agent Land also testified that there was nothing in Appellant's bedroom indicative of the manufacture of methamphetamine.

John Janczak, a criminalist with the Texas Department of Public Safety crime lab in El Paso also testified. He testified that he is a drug analyst and holds a bachelor of science degree in chemistry. On August 16, 2002, he was called out to

804 Lomita. He testified that he was there to test for methamphetamine, but did not test for red phosphorous or iodine because he did not have the capabilities in the lab to exclusively identify those chemicals. He also testified that this evidence would not be gathered because he did not have a license that would allow him to transport hazardous material to the lab to be tested. Mr. Janczak testified that iodine can be in a liquid form or a crystallized form. He indicated that the most available liquid iodine is in a tincture of iodine, which he believed is found in veterinary supply store or agricultural supply stores. He testified that exhibit seven was a liquid form of iodine. He also testified as to the chemicals necessary to make methamphetamine. He testified that you need among other chemicals, iodine and red phosphorous, which can be extracted from a matchbook's striking pad. He testified that coffee filters are used to remove the red phosphorous sludge from the methamphetamine product. He indicated that usually Red Devil lye is used to elevate the Ph level of the liquid to a fairly high basic level. He testified that he had never come across another substance that looks like red phosphorous. He also testified that the following State's exhibits were found to contain methamphetamine: Exhibits 31, 33, 34, 37, and 39.

Next to testify was Detective Thomas White, of the El Paso Police Department. Detective White indicated that he had received training in clandestine labs and had also attended the DEA academy methamphetamine lab training. He testified that the following objects were found at 804 Lomita Drive: a blister pad of Sudafed tablets, a matchbook striker plates used to obtain the red phosphorous, hydrogen peroxide, acetone, and citric acid.

DEA Special Agent Randy Falkner testified next. He indicated that he had been though the clandestine laboratory training. In his experience, he had encountered ten to twelve labs and had been part of dismantling these labs. As part of his training, he learned how to make methamphetamine, including a method called the red phosphorus method. He indicated that red phosphorous looks like fine, granulated powder that is a brownish-red color. He testified that you have to order red phosphorous or get it off the striker plates of matchbooks; to his knowledge, there was not a place in El Paso that sold red phosphorous. Special Agent Falkner testified he had been to 804 Lomita on May 6, 2002. State's Exhibit 26 was a drawing of the house that Special Agent Falkner prepared when he first visited the house. He indicated that bedroom four looked like a teenager's bedroom and had a poster on the wall that read "Got Meth?" In the home, he found empty cans of alcohol, denatured alcohol, and Red Devil lye. He testified that the Appellant had indicated that she had Red Devil lye because she was having problems with her bathtub. It was explained to the Appellant that these items were used to make methamphetamine and Appellant allowed him to destroy such items.

On August 16, Special Agent Falkner testified that the Appellant was polite and was taken into custody without incident. Inside Appellants home, he testified that they found iodine and red phosphorous. He testified that iodine is either in a tincture or in crystal form and that if it is in a crystal form, it looks grayish or silver. He testified that he did not test anything for red phosphorous or iodine because he did not have test kit for these chemicals. He did however field test some powder that came back positive for methamphetamine.

Last to testify was FBI Special Agent Liliana McDowell Saenz. Agent Saenz testified that she investigates drug crimes

and often works with other agencies, including the El Paso Police Department, the El Paso Sheriff's Office, and the DEA. She testified that she received special training at the FBI academy, but could not recall if any of that training involved methamphetamine. She was however familiar with methamphetamine because for the past year and half from the date of the trial, she had worked for the DEA task force and had been involved in several methamphetamine lab raids and investigations.

She testified that prior to August 16, 2002, she had visited 804 Lomita on May 6, 2002. On May 6, she and her partner, Special Agent Falkner were investigating different methamphetamine cases and people involved in methamphetamine drug trafficking, when they were called to help serve a federal search warrant on an individual by the name of Jennifer Perez believed to be at 804 Lomita. Inside the house, they found small quantities of methamphetamine, as well as items used to manufacture methamphetamine. Appellant was explained how these items are used to manufacture methamphetamine and was warned of the dangerous nature of the chemicals, including that a combination of them could cause an explosion. Appellant agreed that the chemicals should be destroyed. Special Agent Saenz testified that on August 16, she saw the Appellant with stains on her fingertips similar to those she had seen in other clandestine labs, which was an indication based on her experience, that the Appellant had been handling iodine. On cross-examination, she indicated that she had not put this information in her report.

At the conclusion of the presentation of the evidence, the jury found the Appellant guilty and sentenced her to ten years confinement. Appellant timely filed this notice of appeal.

■ In Issues One and Two, Appellant contends the evidence is not legally and factually sufficient to sustain a conviction for the offense of unlawful possession of certain chemicals with intent to manufacture methamphetamine. The State asserts in its brief that Appellant failed to preserve her factual sufficiency claim because she does no more than state the standard of review for a factual sufficiency review and fails to present anything for review. Further, the State contends that because the Appellant is seeking an acquittal, rather than a new trial, that this Court should construe her complaint as solely a legal sufficiency point. The State cites to *Villalobos v. State*, 951 S.W.2d 232, 234 (Tex. App.-El Paso 1997, no pet.), to support this contention. We therefore begin by addressing whether Appellant has properly preserved her factual sufficiency point.

In *Villalobos*, this Court stated,

In his first point of error, Appellant argues that there is no evidence that Sam Massey owned any of the stolen property. Because [Appellant] only seeks acquittal rather than a new trial, we construe his complaint as one of legal sufficiency rather than factual sufficiency.

*Villalobos*, 951 S.W.2d at 234. While it is true that Appellants prayer request for an acquittal, it also in the alternative requests for a new trial. Unlike in *Villalobos*, in this case, Appellant provides both a legal and factual sufficiency of the evidence standard of review and argues that the evidence is insufficient on both grounds. In the interest of justice to the Appellant, we will consider both the legal and factual sufficiency of the evidence.

### Standards of Review

■ In reviewing the legal sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict to

determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Hernandez v. State*, 946 S.W.2d 108, 110–11 (Tex.App.-El Paso 1997, no pet.). Sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 239–40 (Tex.Crim. App.1997). We do not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any witnesses, as this was the function of the trier of fact. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex.Crim. App.1992); *Matson v. State*, 819 S.W.2d 839, 843 (Tex.Crim.App.1991); *Lucero v. State*, 915 S.W.2d 612, 614 (Tex.App.-El Paso 1996, pet. ref'd). Instead, our duty is to determine whether if both the explicit and implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial in the light most favorable to the verdict. *See Adelman*, 828 S.W.2d at 421–22; *Lucero*, 915 S.W.2d at 614. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Matson*, 819 S.W.2d at 843; *Lucero*, 915 S.W.2d at 614.

■■■ In reviewing the factual sufficiency of the evidence, we must determine whether considering all the evidence in a neutral light, the jury was rationally justified in finding guilt beyond a reasonable doubt. *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex.Crim.App.2004); *see also Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim. App.1996). There are two ways in which we may find the evidence to be factually insufficient. *Zuniga*, 144 S.W.3d at 484. Evidence is factually insufficient when the evidence supporting the verdict, considered alone, is too weak to support the finding of guilt beyond a reasonable doubt.

*Id.* Evidence is also insufficient when contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt. *See id.* at 485. However, in our factual sufficiency review, we must give appropriate deference to the jury and should not intrude upon its role as the sole judge of the weight and credibility given to evidence presented at trial. *See Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App.2000); *Clewis*, 922 S.W.2d at 133. Accordingly, we are authorized to set aside the jury's finding of facts only in instances where it is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Clewis*, 922 S.W.2d at 135.

Appellant was indicted for the possession of the immediate precursors, iodine and red phosphorous, with the intent to unlawfully manufacture a controlled substance, methamphetamine. On appeal, Appellant specifically argues that the State failed to produce evidence of: (1) Appellant's possession of the chemicals red phosphorous and iodine; (2) that iodine and red phosphorous are immediate precursors; and (3) that the chemicals found were in fact iodine and red phosphorous. We begin with Appellant's assertion that the evidence was legally and factually insufficient to prove that iodine and red phosphorous are immediate precursors.

■■■ Appellant asserts that the evidence was legally and factually insufficient because the State failed to produce evidence that red phosphorous and iodine are immediate precursors under the Texas Health and Safety Code § 481.124. *See* TEX.HEALTH & SAFETY CODE ANN. § 481.124 (Vernon Supp.2004–05). Under Texas Health and Safety Code § 481.124(a)(2):

(a) A person commits an offense if, with intent to unlawfully manufacture a controlled substance, the person possesses or transports:

. . .

(2) an immediate precursor. . . .

*See* TEX.HEALTH & SAFETY CODE ANN. § 481.124(a)(2). The immediate precursors in this case were iodine and red phosphorous. Appellant alleges that since the indictment included these two chemicals, the State had to prove that these are immediate precursors.

Under Section 481.002(22), immediate precursor is defined as follows:

(22) [A] substance the director finds to be and by rule designates as being:

(A) a principal compound commonly used or produced primarily for use in the manufacture of a controlled substance;

(B) a substance that is an immediate chemical intermediary used of likely to be used in the manufacture of a controlled substance; and

(C) a substance the control of which is necessary to prevent, curtail, or limit the manufacture of a controlled substance.

*See* TEX.HEALTH & SAFETY CODE ANN. § 481.002(22). The State requests for this Court to take judicial notice of the Texas Register listing for immediate precursors. The Texas Register contains an order signed by Dr. Eduardo J. Sanchez on August 12, 2002, which lists immediate precursors. *See* 27 TEX.REG. 8327–28 (2002). The lists includes iodine and red phosphorous. *Id.*

■■■■ It is unclear from the record whether the trial court took judicial notice of the list, but there is evidence of the trial court's knowledge of the list in the discussions between the attorneys and the trial court regarding the Appellant's motion for an instructed verdict. However, on appeal, we have the power to take judicial notice for the first time. *See Langdale v. Villamil,* 813 S.W.2d 187, 189–90 (Tex.

App.-Houston [14th Dist.] 1991, no writ). Therefore, we judicially note that red phosphorous and iodine are immediate precursors as prescribed by the Texas Commissioner of Health.

■■■■ When an accused is charged with unlawful possession of a controlled substance, the State must prove that the defendant exercised actual care, custody, control, or management over the contraband and that he knew the substance in his possession was a controlled substance. *Brown v. State,* 911 S.W.2d 744, 747 (Tex. Crim.App.1995); *see also Menchaca v. State,* 901 S.W.2d 640, 651 (Tex.App.-El Paso 1995, pet. ref'd). When the controlled substance is not found in the accused's exclusive possession, additional independent facts must affirmatively link the accused to the controlled substance. *See Taylor v. State,* 106 S.W.3d 827, 830–31 (Tex.App.-Dallas 2003, no pet.). The "affirmative links" analysis is used by courts to review evidence relating to the accused's knowledge and control of the controlled substance. *See McQuarters v. State,* 58 S.W.3d 250, 259 (Tex.App.-Fort Worth 2001, pet. ref'd). Possession may be proved by circumstantial evidence. *See Wootton v. State,* 132 S.W.3d 80, 87 (Tex. App.-Houston [14th Dist.] 2004, pet. ref'd). The evidence, however, must demonstrate that the accused's connection to the controlled substance was more than just fortuitous. *See id.* Factors typically used when determining whether the evidence is sufficient to affirmatively link an accused to a controlled substance include: (1) whether the contraband was found in proximity to and accessible to the defendant; (2) whether the defendant was present when the drugs were found; (3) whether the defendant possessed other contraband or drug paraphernalia; (4) whether there was an odor of the contraband; (5) whether the defendant owner or had the right to

possess the place where the drugs were found; (6) whether the place where the drugs were found was enclosed; (7) whether the accused was the driver of the automobile in which the contraband was found; (8) whether the defendant was found with a large amount of cash; (9) whether the defendant was under the influence of narcotics when arrested; (10) the amount of drugs found; and (11) whether the defendant possessed weapons. *Taylor,* 106 S.W.3d at 831; *McQuarters,* 58 S.W.3d at 259; *see also Hudson v. State,* 128 S.W.3d 367, 374 (Tex.App.-Texarkana 2004, no pet.). The number of relevant factors is less significant than the logical force to which they establish a link between the accused and the controlled substance. *See Taylor,* 106 S.W.3d at 831; *Hudson,* 128 S.W.3d at 374. Further, the links need not be so strong as to rule out every other possibility except the defendant's guilt. *Brown v. State,* 911 S.W.2d 744, 748 (Tex. Crim.App.1995); *Wootton,* 132 S.W.3d at 87. Accordingly, affirmative links are established by the totality of the circumstances. *See Wootton,* 132 S.W.3d at 87.

In this case, when the search warrant was executed, inside the house was the Appellant, whom officers found getting out of bed in bedroom one, and two other individuals identified as Antonio Banda and Myra Gonzalez. A water bill addressed to the Appellant at the 804 Lomita address and for that residence was found inside the house. Detective Candelaria testified that he observed stains in the kitchen sink which based on his experience and training, were consistent with iodine stains. There were also coffee filters with a reddish powder in them, which Detective Candelaria testified he believed was red phosphorous. In his experience, he had seen coffee filters used to filter red phosphorous. Additional items found in the house were a generator, often used in the manufacturing of methamphetamine, a

tincture of iodine was found in the living room inside a credenza, and a gram scale. In bedroom three, which was believed to be Ms. Gonzalez's room, they found some unknown liquid and pipes, two small bags that were thought to contain methamphetamine, a Coleman fuel tank, a heating element, a burner, tubing, and funnel. They also found a bucket with discarded matchbooks that appeared to have the striker plates missing. Detective Candelaria testified that the striker plates contain red phosphorous and in his experience are used to extract the red phosphorous in the manufacturing process of methamphetamine. Detective Candelaria also testified that when they first arrived at the house, he noticed a pungent smell which continued to be present once he was inside the house. He however failed to mention this in his report and he agreed with defense counsel that this would be important information to place in the report.

Special Agent Phillip Austin Land testified that based on his experience, a typical characteristic of methamphetamine offenders is that their fingertips have a gray or yellowish stain on them that is very hard to remove. Special Agent Austin testified that he saw a red substance in the kitchen, that based on his experience and training, he believed it to be red phosphorous. He also testified that based on his experience and training, the substance in the kitchen sink was iodine. He also noticed Appellant's fingertips were a gray-yellowish color and that the house had a distinct smell which he recognized as the same smell of other methamphetamine labs. On cross-examination, he testified that he did not put the information regarding the fingertips and the odor in his report, although he agreed with defense counsel that this would have been pretty damaging evidence against the Appellant. Additionally, there

was no photograph taken of Appellant's hands.

Special Agent Liliana McDowell Saenz testified that Appellant's hands were dirty and her fingertips were stained and that based on her experience, people with those stains on their hands are usually involved in handling iodine. Special Agent Saenz did not put this information in her report, although she testified that this would be considered something important to put on the report.

There was also evidence regarding a visit to the same residence on May 6, 2002, where at the time, Mr. Banda and Ms. Gonzalez were not living at the residence. Several items were found inside the house indicative of a methamphetamine lab and it was explained to the Appellant that these items are used to make methamphetamine. After speaking to the Appellant for about half an hour, she gave the officers permission to get rid of those items. They also found a poster in one of the bedrooms that read "Got Meth?"

█ Reviewing the evidence in the record, we find that there was sufficient evidence affirmatively linking the Appellant to the red phosphorous and iodine. Appellant also alleges that the State failed to prove that the substances were in fact red phosphorous and iodine. Specifically, Appellant argues that these substances were never tested and points out that in cases dealing with controlled substances, there is always testing done of the controlled substance. The State responds that under Rule of Evidence 701, the officers testimony is admissible to assist the fact finder in determining whether a substance is what the State alleges it to be.

Texas Rule of Evidence 701 states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

The record before us contains the testimony of drug analyst for the Texas Department of Public Safety John Janczak who testified that he was testing for methamphetamine but did not test for red phosphorous or iodine. He testified that he did not have the capabilities in the lab to exclusively identify those chemicals. He also provided testimony regarding iodine. He testified that iodine can be in a liquid form or in crystalline form. He testified that Exhibit 7 was a liquid form of iodine. He testified that to make methamphetamine, you could get some of the ingredients from cold tablets such Sudafed and red phosphorous can be extracted from a matchbook's striking pad and that you of course also needed iodine. He also testified that filtering of the red phosphorous is often done with coffee filters. He also testified that Red Devil lye is commonly used in the process as well. He testified that he's never come across another substance that looks like red phosphorus. There was also additional testimony provided by the officers regarding the substances they observed and that based on their experience and training, they believed the chemicals to be red phosphorous and iodine.

Given all the testimony regarding the chemicals found in Appellant's home, we find that the State provided sufficient evidence to prove that the substances were in fact red phosphorous and iodine. After reviewing the evidence in the light most favorable to the verdict, we find that a rational trier of fact could have found the essential elements of the offenses beyond a reasonable doubt. We additionally find that the evidence was not so weak as to be

clearly or manifestly unjust, nor is it contrary to the overwhelming weight of the evidence. Issues One and Two are overruled.

In Issue Three, Appellant argues that the trial court erred in allowing the State to present evidence of extraneous offenses committed by the Appellant without notice being given to the Appellant, and in so doing, denied the Appellant a right to a fair trial. In Issue Four, Appellant argues that the trial court erred by allowing the State to present evidence of an extraneous nature that was more prejudicial than probative thereby denying Appellant of a right to a fair trial. The State contends that Appellant did not preserve these issues for review because she objected initially to the testimony concerning the extraneous offense, but then she did not ask for a running objection. We agree.

In order to preserve error, a party must make a timely and specific objection. TEX.R.APP.P. 33.1. Further, a party must continue to object every time inadmissible evidence is offered. *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim.App.1991); *Gillum v. State*, 888 S.W.2d 281, 285 (Tex.App.-El Paso 1994, pet. ref'd); TEX.R.APP.P. 33.1. Error in the admission of evidence is cured when the same evidence is admitted elsewhere without objection. *Ethington*, 819 S.W.2d at 858; *Hudson v. State*, 675 S.W.2d 507, 511 (Tex.Crim.App.1984). To preserve error, Appellant could have requested a running objection, or objected outside the presence of the jury to all the testimony he deemed objectionable as permitted by TEX.R.EVID. 103(a)(1). *See Ethington*, 819 S.W.2d at 858–59; *Gillum*, 888 S.W.2d at 285; *Rawlings v. State*, 874 S.W.2d 740, 742 (Tex.App.-Fort Worth 1994, no pet.); *Mack v. State*, 872 S.W.2d 36, 38 (Tex. App.-Fort Worth 1994, no pet.).

Here, after defense counsel made a timely objection to a specific prosecution question directed at Special Agent Falkner's testimony in the presence of the jury, she failed to continue objecting to other questions which elicited the extraneous offense evidence. When Special Agent Saenz was asked a specific question regarding the same events, defense counsel made another timely objection, but again failed to continue to object to the following questions regarding the extraneous offense. In so doing, she allowed the same evidence to come in without objection. In both instances, defense counsel did not utilize either of the alternate methods of preserving error, by making a running objection, or getting a court ruling to offered testimony out of the jury's presence. We hold that Appellant did not preserve any error which may have occurred by admitting the officers' testimony of the May 6 incident. We overrule Issues Three and Four.

In Issue Five, Appellant contends that the trial court committed error by including the following sentence in the definitions section of the jury charge: "[t]he list of immediate precursors includes iodine and red phosphorous." Appellant asserts that "[n]ot only is that an untrue statement but by including that statement in the Court's Charge, the jury will conclude that the State doesn't have to prove that element of the indictment." At trial, the Appellant lodged the objection to the inclusion of this statement in the jury charge on the grounds that there was no evidence presented at trial that it was illegal to possess either of these chemicals and no evidence as to the fact that these two substances are immediate precursors. On appeal, Appellant's complaint is that the definition was an improper opinion on the weight of the evidence. Appellant has failed to preserve this issue on appeal be-

cause this complaint on appeal does not comport to the objection made at the trial. *See Broxton v. State,* 909 S.W.2d 912, 918 (Tex.Crim.App.1995).

When an Appellant alleges jury charge error on appeal, our first task is to determine whether error actually exists in the charge. *Hutch v. State,* 922 S.W.2d 166, 170 (Tex.Crim.App.1996); *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim.App.1985)(Opin. on reh'g). If there is jury charge error, we then must determine if the error caused sufficient harm to warrant reversal. *Hutch,* 922 S.W.2d at 170–71; *Almanza,* 686 S.W.2d at 171. Appellant's objection at the trial court does not comport with the issue raised on appeal and therefore, we treat Appellant's complaint as thought she did not object to the claimed charge error at trial. When error has not been properly preserved, we will reverse only if the error is so egregious and created such harm that the appellant was denies a fair and impartial trial. *Arline v. State,* 721 S.W.2d 348, 351 (Tex.Crim.App.1986); *Almanza,* 686 S.W.2d at 171. A determination of egregious harm requires that we examine the charge as a whole, the state of the evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *Almanza,* 686 S.W.2d at 171; *see also Hutch,* 922 S.W.2d at 171.

In reviewing the jury charge for any alleged error, an appellate court must examine the charge as a whole and not as a series of isolated and unrelated statements. *Dinkins v. State,* 894 S.W.2d 330, 339 (Tex.Crim.App.1995), *cert. denied,* 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995). The function of the jury charge is to instruct the jury on the law applicable to the case. TEX.CODE CRIM.PROC. ANN. art. 36.14 (Vernon Supp.2004–05). A trial court has broad discretion in sub-

mitting proper definition and explanatory phrases to the jury. *Macias v. State,* 959 S.W.2d 332, 336 (Tex.App.-Houston [14th Dist.] 1997, pet. ref'd). If a term or word is statutorily defined, the trial court must submit the statutory definition to the jury. *See Arline,* 721 S.W.2d at 352 n. 4 (statutorily defined word must be included in the charge as apart of the law applicable to the case); *Roise v. State,* 7 S.W.3d 225, 242 (Tex.App.-Austin 1999, pet. ref'd) (statutory definition should be submitted).

In this case, whether red phosphorous and iodine were immediate precursors was not a question of fact to be resolved by the trier of fact. Whether a chemical is a immediate precursor must be determined in consideration of the list put out by the Texas Health Commissioner. TEX.R.EVID. 204 states:

> A court upon its own motion may, or upon the motion of a party shall, take judicial notice of the ordinances of municipalities and counties of Texas, of the contents of the Texas Register ... The court's determination shall be subject to review as a ruling on a question of law.

In this case, the jury charge instruction Appellant complains of was an instruction in accordance with the Texas Register. The extra sentence declaring red phosphorous and iodine as immediate precursors was an extension of the definition of immediate precursors. The Appellant has failed to show and we do not find any error in the jury charge. As such we overrule Issue Five.

Accordingly, we affirm the trial court's judgment.