

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| IRENE CARBAJAL, | § | |
| | | No. 08-18-00081-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | County Criminal Court No. 2 |
| THE STATE OF TEXAS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC# 20170C10979) |
| | § | |

## **O P I N I O N**

A jury found Appellant, Irene Carbajal, guilty of the Class B misdemeanor offense of theft of property of the value $100 or more but less than $750,[1] and it assessed her punishment at confinement for thirty days. In her sole issue, Appellant contends that the trial court erred in not providing the jury with the definition of "with intent" in the jury charge and she was egregiously harmed by the error.

We affirm.

---

[1] *See* TEX. PENAL CODE ANN. § 31.03(a), (e)(2)(A).

**Background**

Devon Carter testified that on December 18, 2017, she was employed as a sales associate in the juniors department in the Dillard's Department Store in the Cielo Vista Mall. At approximately 8:00 p.m., she saw Appellant, who was shopping with her sister and niece, "sitting in the middle" of the dresses department and asked her if "she needed any help." Appellant stated that she did not need any help as her group "had already gotten a fitting room." Carter then went to a cash register and "waited until they were ready to pay or if they needed [her] help."

After Appellant's sister and niece, who was carrying a Macy's shopping bag, exited the fitting room and the group had left the dresses department, Carter "went to go clean the fitting room," finding "only hangers left in there." She then "called cameras," i.e., store security, "to let them know there were some hangers left in the fitting room." Carter then saw the group go to "juniors jeans," and she notified another sales associate there that "we were keeping an eye on them."

The State offered and the trial court admitted into evidence State's Exhibit Number 6, a videotape recording of what Carter had witnessed in the junior jeans department on December 18, 2017. While the videotape was being played for the jury, Carter further testified that she saw Appellant standing behind her sister with a "brown dress on the wall." She then saw Appellant, who was carrying a Dillard's bag and a purse, with three dresses in her hand. Carter noted that she had spoken twice with Appellant that evening, and Appellant was "acting very anxious, very nervous. She was speaking very quickly." And Appellant was "picking up clothing without really looking at them, putting them back down."

While Appellant's sister went into the fitting room with the dresses, Appellant went to the "Puma section, taking items . . . a pair of pants, maybe a jacket." Subsequently, Appellant, with

some Puma items, entered the fitting room with her sister at which point, "it took them -- at least the defendant's sister -- a little while to get in and out of there. They were in the fitting room "like maybe a minute and a half." Appellant "left earlier than her sister," being in the fitting room "like a minute or so." And while Carter stood "with one of the managers at the register," Appellant's niece, while Appellant's sister was still in the fitting room, entered the fitting room for "30 seconds or less." After Appellant, her sister, and her niece "walk[ed] off together," Carter checked the fitting room where she "didn't find anything." She then "called up to the cameras and let them know the dresses that we had seen them go in with were gone."

Carter explained that although she had "asked them twice if they needed help or if they were ready to pay," at no point did Appellant, her sister, or her niece attempt to pay for any clothing. Moreover, Carter noted that although Appellant's Dillard's shopping bag "was empty" when she "had first seen her in the video," it was "full after she leaves." "There wasn't as many things in there as there was after she had left the fitting room."

Diana Asselin testified that on December 18, 2017, she was the camera operator at the Dillard's Department Store in the Cielo Vista Mall. After receiving a telephone call from Carter at approximately 8:00 p.m., she, using store security cameras, began to monitor the activities of Appellant, her sister, and her niece in the store. Through a camera, Asselin saw Appellant carrying a Dillard's shopping bag that "didn't look full. It looked small." She then saw Appellant "select[] the Puma merchandise," take it into the fitting room, and remain in the fitting room with her sister for about a "minute and a half." Appellant had "Puma leggings, she had Puma shirts and she had like a -- looks like kind of a sports bra active wear top -- I mean, sports bra." Subsequently, Asselin saw Appellant and her sister "walking out with the merchandise." When Appellant exited the fitting room, her Dillard's bag "did get bigger. It was full . . . it was small before." And as

3

Appellant, her sister, and her niece left the junior denim department, Appellant handed the Dillard's bag to her niece. After she had been advised by sales associates that they found no merchandise in the fitting room after the three had left the department, Asselin authorized security personnel to stop them as they exited the store.

Alma Lozano testified that on December 18, 2017, she was the assistant manager of the women's department at the Dillard's store. At about 8:30 p.m., she followed a security guard as he stopped Appellant, her sister, and her niece as they were leaving the store. After they escorted the three women to an office and Lozano asked them to empty the Dillard's bag, she saw "all the clothing. There [were] several items with a different brand." The Macy's bag contained three Dillard's dresses rolled into three towels. The Dillard's bag contained three Dillard's Puma items and other clothing items from Dillard's. The total value of the Dillard's items found in the possession of Appellant, her sister, and her niece was approximately $650. And the total value of the Dillard's Puma merchandise was approximately $215. Lozano noted that at no time did Appellant attempt to pay for any of the clothing, and she did not have Lozano's or Dillard's consent to take any of the clothing.

**Standard of Review**

We review complaints of jury-charge error under a two-step process, considering first whether error exists. *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013); *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). If error does exist, we then review the record to determine whether the error caused sufficient harm to require reversal. *Wooten*, 400 S.W.3d at 606. If the defendant preserved error by timely objecting to the charge, an appellate court will reverse if the defendant demonstrates that he suffered some harm as a result of the error. *Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). If the defendant did not object at trial, we

4

will reverse only if the error was so egregious and created such harm that the defendant did not receive a fair and impartial trial. *Id*. at 26.

## Charge Error

In her sole issue, Appellant argues that the trial court erred in not providing the jury with the definition of "with intent" in the jury charge because it "effectively eliminated an essential element of the offense of theft." She asserts that "[w]ithout the definition, the jury was effectively able to convict" her "if they merely believed that she should have known that her niece, her sister, or both, were stealing from" Dillard's. She further asserts that she was egregiously harmed by the trial court's error.

The Texas Legislature has expressly defined the phrase "with intent," stating:

A person acts . . . with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

TEX. PENAL CODE ANN. § 6.03(a).

A trial court has an absolute duty to prepare a jury charge that accurately sets out the law applicable to the case. TEX. CODE CRIM. PROC. ANN. art. 36.14; *Oursbourn v. State*, 259 S.W.3d 159, 179 (Tex. Crim. App. 2008); *see also Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) ("The purpose of the trial judge's jury charge is to instruct the jurors on all of the law that is applicable to the case."). It must give the instruction for the law applicable to the case regardless of whether it has been specifically requested. *Oursbourn*, 259 S.W.3d at 179–81. Further, as noted by the Texas Court of Criminal Appeals, "[a] charge could not fully set forth that law without including the definitions of those words and phrases that have been legislatively provided." *Arline v. State*, 721 S.W.2d 348, 352 n.4 (Tex. Crim. App. 1986). And this Court has expressly stated, "[i]f a term or word is statutorily defined, the trial court must submit the statutory

5

definition to the jury." *Miramontes v. State*, 225 S.W.3d 132, 145 (Tex. App.—El Paso 2005, no pet.). Thus, as conceded by the State, the trial court erred in not providing the jury with the definition of "with intent" in the jury charge. *See Arline*, 721 S.W.2d at 352 n.4; *Miramontes*, 225 S.W.3d at 145.

As noted above, when, as here, a defendant fails to object, or states that she has no objection to a charge, an error in the charge does not require reversal unless the record shows "egregious harm" to the defendant. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). Egregious harm exists when the record shows that a defendant has suffered actual, rather than merely theoretical, harm from jury-charge error. *Id*. at 174. Egregious harm consists of error affecting the very basis of the case or depriving the defendant of a valuable right, vitally affecting a defensive theory, or making the case for conviction or punishment clearly and significantly more persuasive. *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991); *Martinez v. State*, 190 S.W.3d 254, 259 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). To determine whether a defendant has sustained harm from either an objected-to or a non-objected-to instruction, we consider the four *Almanza* factors: (1) the entire charge, (2) the state of the evidence, including the contested issues and the weight of the probative evidence, (3) the argument of counsel, and (4) any other relevant information revealed by the record of the trial as a whole. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996); *Almanza*, 686 S.W.2d at 171.

Here, the trial court instructed the jury in the application paragraph of its charge as follows:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 18th day of December, 2017, in El Paso County, Texas, the Defendant, IRENE CARBAJAL, did then and then, acting alone or as a party as that term has been previously defined, did then and there unlawfully appropriate, by acquiring and otherwise exercising control over property other than real property, to wit: clothing of the value of $100.00 or more, but less than $750.00, without the effective consent of the owner, Dillard's or Diana Asselin, *with intent* to deprive

6

said owner of said property, you will find the Defendant guilty . . . . [Emphasis added].

Although the trial court did not define the phrase "with intent" in its charge to the jury, it, in the application paragraph of the charge, expressly required the jury to find that Appellant, acting alone or as a party, appropriated the clothing "with intent to deprive" Dillard's of it.

The Texas Court of Criminal Appeals has explained that "when the statutory definition is not included in the charge, it is assumed the jury would consider the commonly understood meaning in its deliberations." *Olveda v. State*, 650 S.W.2d 408, 409 (Tex. Crim. App. 1983). The word "intent" is commonly understood and defined as "[t]he act or fact of intending or purposing; intention, purpose (formed in the mind)." COMPACT OXFORD ENGLISH DICTIONARY 861 (2nd ed. 1993). Thus, the meaning of "with intent," as defined in the Texas Penal Code, is in accord with the commonly understood and defined meaning of "intent"--the gist of both concerns acting with a purpose. In sum, the statutory definition of "with intent" is "neither complex nor unusual, and the definition is much like the common meaning of the word." *See Nguyen v. State*, 811 S.W.2d 165, 167 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd).

Contrary to Appellant's assertion, the trial court's error in not providing the jury with the statutory definition of "with intent" did not "effectively eliminate[] an essential element of the offense of theft." Nor did the error effectively enable the jury to convict her "if they merely believed that she should have known that her niece, her sister, or both, were stealing from" Dillard's. Indeed, as noted above, the trial court, in the application paragraph of the charge, expressly required the jury to find that Appellant herself, acting alone or as a party, appropriated the clothing "with intent to deprive" Dillard's of it. We conclude that the first *Almanza* factor weighs heavily against a finding of egregious harm.

7

In regard to the evidence, Appellant asserts that "[a]lthough the evidence at trial did tend to show that [she] was in possession of Dillard's property as she was leaving the store, evidence of theft was not conclusive." She also asserts that "[n]o one testified that they saw [her] place Dillard's property in the Dillard's bag." And Appellant argues that "because here the jury was not provided with the legal definition of intent, they were permitted to find [her] guilty based merely on their conclusion that [she] was with some people who might have placed things in a bag she was carrying."

However, as conceded by Appellant, neither conclusive nor direct evidence of the elements of [an] offense [are] required to establish guilt beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007). "Juries are permitted to make reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor." *Id*. at 14-15. Indeed, "[c]ircumstantial evidence alone can be sufficient to establish guilt." *Id*. at 15.

Here, the State presented ample evidence of Appellant's guilt. It offered and the trial court admitted into evidence State's Exhibit Number 6, a videotape recording of what Carter had witnessed in the junior jeans department in Dillard's on December 18, 2017. While the videotape was being played for the jury, Carter testified that Appellant, while her sister was in the fitting room, went to the "Puma section, taking items . . . a pair of pants, maybe a jacket." Subsequently, Appellant, with some Puma items, entered the fitting room with her sister at which point, "it took them -- at least the defendant's sister -- a little while to get in and out of there." They were in the fitting room "like maybe a minute and a half." Appellant "left earlier than her sister," being in the fitting room "like a minute or so." And after Appellant, her sister, and her niece "walk[ed] off together," Carter checked the fitting room where she "didn't find anything."

8

Carter explained that although she had "asked them twice if they needed help or if they were ready to pay," at no point did Appellant, her sister, or her niece attempt to pay for any clothing." Moreover, Carter noted that although Appellant's Dillard's shopping bag "was empty" when she "had first seen her in the video," it was "full after she leaves." "There wasn't as many things in there as there was after she had left the fitting room." And Carter noted that she had spoken twice with Appellant that evening, and Appellant was "acting very anxious, very nervous. She was speaking very quickly."

Asselin testified that through a security camera, she saw Appellant carrying a Dillard's shopping bag that "didn't look full. It looked small." She then saw Appellant "select[] the Puma merchandise," take it into the fitting room, and remain in the fitting room with her sister for about a "minute and a half." Appellant had "Puma leggings, she had Puma shirts and she had like a -- looks like kind of a sports bra active wear top -- I mean, sports bra." Subsequently, Asselin saw Appellant and her sister "walking out with the merchandise." When Appellant exited the fitting room, her Dillard's bag "did get bigger. It was full . . . it was small before." And as Appellant, her sister, and her niece left the junior denim department, Appellant handed the Dillard's bag to her niece.

Lozano testified that after she and a security guard escorted the three women to an office, she asked them to empty the Dillard's bag, and she saw "all the clothing. There [were] several items with a different brand." Specifically, the Dillard's bag contained three Puma items and other clothing items from Dillard's. The total value of the Dillard's items found in the possession of Appellant, her sister, and her niece was approximately $650. And the total value of the Dillard's Puma merchandise was approximately $215. Lozano noted that at no time did Appellant attempt

to pay for any of the clothing, and she did not have Lozano's or Dillard's consent to take any of the clothing.

The evidence as outlined above does not show, as asserted by Appellant, that she was merely "with some people who might have placed things in a bag she was carrying." Nor did the trial court's charge authorize her conviction based upon such scant evidence. In fact, the evidence establishes that Appellant herself was actively involved in retrieving and acquiring Puma merchandize subsequently found in her Dillard's bag. And the jury, from all the circumstantial evidence, could have reasonably inferred that Appellant, acting alone or as a party, appropriated the clothing "with intent to deprive" Dillard's of it. We conclude that the second *Almanza* factor weighs heavily against a finding of egregious harm.

In regard to the arguments of counsel, Appellant complains that the State, mentioning "intent" only once, argued:

> With the intent to deprive the owner of the property. . . . Did the defendant ever try to purchase the property? Did she ever go up and attempt to actually purchase the Puma wear? . . . Yet, that property, the Puma wear, was found in the Dillard's bag that suspiciously got a lot bigger when she was walking -- when the defendant was walking out. There were no receipts. There were no receipts.

She asserts, thus, that "the State left the jury with the impression that its case was proved merely by showing that Appellant had been in possession of Dillard's property which she had not paid for." And she complains that Appellant's trial counsel "did not mention intent or the definition of intent." Finally, Appellant asserts that the State in rebuttal "implied that the jury should ignore the fact that no one ever saw [her] place Dillard's items in the Dillard's bag" and, without the definition of "with intent," "the jury was effectively able to convict [her] based upon a belief that she should have known that her niece, or her sister, or both, were stealing."

However, the State said nothing improper in arguing that the circumstantial evidence established Appellant's guilt. As noted above, neither conclusive nor direct evidence of the elements of [an] offense [are] required to establish guilt beyond a reasonable doubt. *Hooper*, 214 S.W.3d at 14. And "circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor." *Id*. at 14-15. Moreover, nothing in the State's argument suggested that the jury could convict Appellant based upon a mere "belief that she should have known that her niece, or her sister, or both, were stealing" or by a mere "showing that [she] had been in possession of Dillard's property which she had not paid for."

As noted above, the trial court's error in not providing the jury with the statutory definition of "with intent" did not, as asserted by Appellant, "effectively eliminate[] an essential element of the offense of theft." Nor did the error in any way enable the jury to convict her "if they merely believed that she should have known that her niece, her sister, or both, were stealing from" Dillard's. Indeed, the trial court, in the application paragraph of the charge, expressly required the jury to find that Appellant herself, acting alone or as a party, appropriated the clothing "with intent to deprive" Dillard's of it. And nothing in the arguments of counsel contradicted or in any way confused this correct articulation of the pertinent law. Therefore, the third *Almanza* factor also weighs heavily against a finding of egregious harm.

In regard to the fourth *Almanza* factor, Appellant does not direct us to any other relevant information establishing that she has sustained harm from the trial court's charge error, and our review of the record has revealed none.

In sum, all of the pertinent *Almanza* factors weigh heavily against a finding that Appellant was egregiously harmed by the trial court's error in not defining the phrase "with intent" in its

charge to the jury. Accordingly, we hold that Appellant has failed to establish that she was egregiously harmed by the trial court's charge error.

We overrule Appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.

October 25, 2019

TERRY JENNINGS, Senior Judge

Before Rodriguez, J., Palafox, J., and Jennings, Senior Judge
Jennings, Senior Judge (Sitting by Assignment)

(Do Not Publish)