

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| MIGUEL BYGOYTIA, | § | |
| | | No. 08-17-00226-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 168th District Court |
| THE STATE OF TEXAS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC# 20140D05522) |

## <u>MEMORANDUM OPINION</u>

A jury found Appellant, Miguel Bygoytia, guilty of the offense of murder[1] and assessed his punishment at confinement for life. In two issues, Appellant contends that the trial court, in its charge, erred in instructing the jury that it had to "unanimously acquit [him] of murder before considering [the offense of] manslaughter" and not instructing the jury on the issue of "sudden passion, adequate cause."[2] We affirm.

## BACKGROUND

Enid Hernandez testified that on October 30, 2014, she was in a Social Studies class with her friends and classmates, Appellant and Aaron Ochoa, the complainant, at Paso Del Norte

---

[1] *See* TEX. PENAL CODE ANN. § 19.02(b).

[2] *See* TEX. PENAL CODE ANN. § 19.02(a)(1), (2), (d).

Academy, a charter high school in El Paso. During class, the complainant accused Appellant of "putting a water meter on his car," and a "verbal argument," which did not "get physical," ensued between them. During the argument, Hernandez told them that it was "stupid" for them to be fighting because it was in fact "stupid" and both of them were her friends. Later, after school, Hernandez met up with the complainant who had agreed to drive her home. As they walked to his car in a nearby parking lot, she saw Appellant and another male, who she did not know. The complainant then handed his binder, lip balm, and keys to Hernandez. And she believed that he and Appellant were "going to fight" because of the previous argument they had had in class. While the complainant was standing behind his car and Hernandez was about to open the passenger side door to place his belongings inside, she heard him state in Spanish, "If you're going to shoot, shoot." Hernandez then heard approximately eight to ten gunshots, and she "ducked." Although she did not see "the guns" as they were being fired, she did see Appellant and the other male holding guns when she subsequently looked up. She also saw the complainant "on the ground."

Jason Cagann testified that at approximately 5:00 p.m. on October 30, 2014, he, after getting off work at a restaurant, entered his car, which he had previously parked in a parking lot near Paso Del Norte Academy. As he was backing his car out of its parking space, he heard "what [he] th[ought] sound[ed] like firecrackers," "recurring pops." Cagann then looked into his rearview mirror and saw "a group of people standing around." He saw "a male's body falling to the ground." And he saw a "shooter facing . . . [t]he body." The shooter, standing at a distance of about ten feet away, was shooting a handgun at the body. As he was backing up his car, Cagann heard six to eight gunshots. He heard eight more gunshots after he stopped his car and looked back. And he heard more gunshots "after the body was already on the ground," when he saw "the

2

shooter shooting at the body on the ground." Cagann explained that he saw the body on the ground "jerk or twitch a couple of times" while it was being shot.

Vanessa Ruiz testified that after about 4:30 p.m. on October 30, 2014, while she was in her car stopped at a traffic signal, she saw a group of students in a parking lot near Paso Del Norte Academy. Suddenly, she saw two young men pointing guns at another young man who was a "very minimal distance" away. Ruiz heard continuous shots fired and was in "disbelief of the coldness and the anger." She saw that one shooter was slightly in front of the other and held his gun at a 90-degree angle while the other shooter held his gun at a tilted angle. And Ruiz identified Appellant in court as the shooter who was in the forward position. As the complainant was on the pavement bleeding, she saw "a black SUV pull up," the two young men enter it, and the SUV "drive off."

El Paso Police Department Detective Ray Sanchez testified that on October 31, 2014, he was assigned to execute a warrant to arrest Appellant for the murder of the complainant. After arresting Appellant, transporting him to a police station, and placing him in an interview room, Sanchez advised Appellant of his legal rights and asked if he wished to provide a recorded video statement. Appellant agreed, spoke with Sanchez for about 40 minutes, and was "very calm," "very cooperative."

The trial court, without objection, admitted into evidence State's Exhibit 69, Appellant's recorded video statement, and State's Exhibit 78, a transcript of the statement. In his statement, Appellant noted that one or two days before the shooting, a teacher at Paso Del Norte Academy had asked him to remove a necklace that he was wearing. Appellant refused, and while he was "cussing out" the teacher, the complainant must have "misunderstood" and "thought" that Appellant was "talking to him." "So," the complainant "started cussing . . . out" Appellant. On

3

the day of the shooting, in their Social Studies class, the complainant "kept bragging about [the] day that he thought [Appellant] was talking to him," "called [him] out," and raised his voice. Appellant explained that he "started like mad-dogging" the complainant because he "started getting [Appellant] mad" by telling him, "Put your head down, put your head down." Appellant responded, "We'll see what's up after school. . . . I need to go sit back down." After the class, Appellant "went to go get" two guns from a friend and "waited for [the complainant] after school."

Appellant, in his statement, further noted that he returned to school, waited for the complainant at about "5:06 or 5:07" p.m., and "went for" the complainant at his car. As he approached his car, the complainant saw Appellant and took off some clothes, preparing to "box," fight. When the complainant "got close" and saw the guns, he said, "Well, pop me. See if you're gonna pop me," or "Well, let me see you pop it." Appellant then "started shooting" the complainant, firing about eight rounds. He denied that another shooter was present, stating that he had shot both guns repeatedly. And he continued to shoot the complainant about three to five times after he had fallen to the ground.

Dr. Juan Contin, a Deputy Medical Examiner for El Paso County, testified that on October 31, 2014, another doctor in his office, Dr. Mario Rascon, performed an autopsy on the complainant's body. And Contin reviewed and cosigned Rascon's autopsy report. The autopsy revealed that the complainant had suffered 10 separate gunshot wounds and the cause of the complainant's death was "multiple gunshot wounds."

In his defense, Appellant testified that in the fall of 2014, while he was a student at Paso Del Norte Academy, he "had problems" with the complainant, who was also a student. They had problems that "young kids have . . . [a]lways arguing over stupid stuff," and "it ke[p]t getting worse." Appellant told his mother about the problems, and they met with the principal and Social

4

Studies teacher to request that Appellant be moved to another Social Studies class away from the complainant. However, the school did not grant their request. On October 28, 2014, Appellant's Social Studies teacher removed him from class, and the complainant, believing that Appellant had made a remark directed at him, became angry. Later, the complainant, who Appellant described as a "much bigger guy," threatened him.

On October 30, 2014, in their Social Studies class, the complainant walked the length of the classroom to confront Appellant and challenge him to a fistfight. Appellant responded, "after school." And he understood the fight would take place in "the parking lot where [the complainant] would park his car." Because he was "panicked" about seeing the complainant and his friends in school throughout the day, Appellant did not attend the rest of his classes. Instead, he went home and played video games. He contacted Gustavo Valencia, a friend, who joined him at his house. Appellant then told Valencia about what had happened with the complainant earlier at school, and he asked Valencia to come with him to the after-school fight to back him up. Appellant wanted Valencia to join him because he knew that the complainant would bring others with him as he had heard in class that "they were already planning to try to jump" him.

As Appellant and Valencia were "walking out the door," Appellant made the decision to take guns to the fight to "scare" the complainant. He took a "nine-millimeter Glock" and gave a "380 Bersa" to Valencia. Appellant explained that for the protection of his home, he had previously stolen the guns from a friend in August or September of 2014 and he had "shoplifted the bullets for [the] guns." He noted that he had previously placed the bullets into the guns in August or September, not as he left his house on October 30, 2014. Appellant conceded that he knew it was "reckless to be taking a firearm to a fistfight," and he assured Valencia, who did not

5

know the complainant, "a number of times" that he was "sure" that all he wanted to do was to "scare" the complainant.

Appellant further testified that a few minutes after he and Valencia had arrived at the parking lot, the complainant and a "couple of kids from school," including Enid Hernandez, arrived. The complainant gave his lip balm, binder, and keys to Hernandez. And when Appellant and Valencia pulled out their guns, the complainant stated, once in English and once in Spanish, "[S]hoot me, . . . pussy." Appellant then shot the complainant, but he did not remember firing his gun several times; he only remembered firing it once. After shooting the complainant, Appellant and Valencia then "jump[ed] into" a SUV driven by a friend, Aaron Armando Torres, who had previously agreed to give Appellant a ride home after school.

**Briefing Waiver**

At the outset, the State argues that Appellant has waived his two issues for our review as inadequately briefed because he "wholly fails to explain how or why the jury charge was actually erroneous, [and] the entirety of his argument . . . is devoted to the harm analysis." *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005).

An appellant's "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities[.]" TEX. R. APP. P. 38.1(i). An appellant waives an issue on appeal if he does not adequately brief the issue by presenting supporting arguments and authorities. *See id.*; *Wilson v. State*, 473 S.W.3d 889, 901 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (citing *Cardenas v. State,* 30 S.W.3d 384, 393 (Tex. Crim. App. 2000)). However, to avoid waiver and obtain a just, fair, and equitable adjudication of a litigant's rights, we liberally construe briefs. *See Nassouri v. State*, 503 S.W.3d 416, 420 (Tex. App.—San Antonio 2016, no pet.) (quoting *Marroquin v. State,* 112 S.W.3d 295, 303 (Tex. App.—El Paso 2003, no pet.)).

Having thoroughly reviewed Appellant's brief, we conclude that he has, as illustrated below, adequately briefed his two issues by presenting supporting arguments and authorities regarding his contentions that the trial court erred in instructing the jury that it had to "unanimously acquit [him] of murder before considering [the offense of] manslaughter" and not instructing the jury on the issue of "sudden passion, adequate cause." Accordingly, we address Appellant's issues.

## Standard of Review

Trial courts must "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case[.]" TEX. CODE CRIM. PROC. ANN. art. 36.14; *see Mendez v. State*, 545 S.W.3d 548, 551–52 (Tex. Crim. App. 2018). Thus, "alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012).

We review complaints of jury-charge error under a two-step process, considering first whether error exists. *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). If error does exist, we then review the record to determine whether the error caused sufficient harm to require reversal. *Id*. If the defendant preserved error by timely objecting to the charge, an appellate court will reverse if the defendant demonstrates that he suffered some harm as a result of the error. *Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). If the defendant did not object at trial, we will reverse only if the error was so egregious and created such harm that the defendant did not receive a fair and impartial trial. *Id*. at 26.

## Charge Error

In his first issue, Appellant argues that the trial court, in its charge, erred in instructing the jury that it had to "unanimously acquit [him] of murder before considering [the offense of]

manslaughter" because the language used in the charge effectively confused "the jury as to the order of deliberation." In his second issue, Appellant argues that the trial court, in its charge, erred in not instructing the jury on the issue of "sudden passion, adequate cause" because a "significant amount of evidence conveys that [he] acted based on his sudden passion, provoked by an adequate cause."

As noted above, a trial court has an absolute duty to prepare a jury charge that accurately sets out the law applicable to the case. TEX. CODE CRIM. PROC. ANN. art. 36.14; *see Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) ("The purpose of the trial judge's jury charge is to instruct the jurors on all of the law that is applicable to the case."). Specifically, it must give the instruction for the law applicable to the case regardless of whether it has been specifically requested. *Oursbourn v. State*, 259 S.W.3d 159, 179 (Tex. Crim. App. 2008). Also, as noted by the Texas Court of Criminal Appeals, "[a] charge could not fully set forth that law without including the definitions of those words and phrases that have been legislatively provided." *Arline v. State*, 721 S.W.2d 348, 352 n.4 (Tex. Crim. App. 1986). And this court has expressly stated, "[i]f a term or word is statutorily defined, the trial court must submit the statutory definition to the jury." *Miramontes v. State*, 225 S.W.3d 132, 145 (Tex. App.—El Paso 2005, no pet.).

Further, as noted above, when a defendant fails to object, or states that he has no objection to a charge, an error in the charge does not require reversal unless the record shows "egregious harm" to the defendant. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). Specifically, egregious harm exists when the record shows that a defendant has suffered actual, rather than merely theoretical, harm from jury-charge error. *Id*. at 174. Egregious harm consists of error affecting the very basis of the case or depriving the defendant of a valuable right, vitally affecting a defensive theory, or making the case for conviction or punishment clearly and

8

significantly more persuasive. *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)*; Martinez v. State*, 190 S.W.3d 254, 259 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). To determine whether a defendant has sustained harm from either an objected-to or a non-objected-to instruction, we consider the four *Almanza* factors: (1) the entire charge, (2) the state of the evidence, including the contested issues and the weight of the probative evidence, (3) the argument of counsel, and (4) any other relevant information revealed by the record of the trial as a whole. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996); *Almanza*, 686 S.W.2d at 171.

### *Sequencing Instruction*

Appellant first asserts that the trial court's jury instructions pressured the jury to find him guilty of the greater offense of murder by precluding the jury from considering whether he was guilty of the lesser-included offense of manslaughter unless it first unanimously agreed to acquit him of murder. He argues that because there is evidence that he did not intend to kill or cause serious bodily injury to the complainant and only intended to "scare" him, an intent defense his trial counsel urged during closing arguments, the jury could have found him guilty of manslaughter, but for the structure of the jury charge. In other words, Appellant complains that the trial court's charge "misinstructed the jury as to the order of deliberation [and] required the jury definitively to acquit [him] of murder before it could consider manslaughter." He asserts that the trial court should have informed the jury that it could consider the manslaughter instruction "even if the jury hung[.]"

After the State rested, Appellant moved for a directed verdict of not guilty on the offense of murder, arguing that because the evidence showed that he did not intentionally or knowingly cause the complainant's death, the State had failed to prove the elements of the offense of murder beyond a reasonable doubt. The trial court denied the motion.

9

During the jury-charge conference, the following colloquy occurred:

[DEFENSE COUNSEL]:    [T]he only modification I would ask the court to consider -- I know we've gone over this for days -- is that I don't believe the jury has to find the defendant not guilty of murder. I think the application paragraph should be[,] "If you cannot reach a unanimous verdict of murder, then you may consider the lesser offense of voluntary manslaughter." Rather than "You have to find the defendant not guilty of murder first before you can consider" –

THE COURT:    Right.

[DEFENSE COUNSEL]:    -- I mean "before you can consider manslaughter."

THE COURT:    Right. I understand the argument and I'm not going to change the charge.

The trial court, in its charge, instructed the jury, in relevant part, as follows:

**Murder**

. . .

**Application of Law to Facts**

A. You must determine whether the state has proved, beyond a reasonable doubt, two elements. The elements are that—

    1. in El Paso County, Texas, on or about October 30, 2014, the defendant caused the death of an individual, Aaron Ochoa, by shooting Aaron Ochoa with a firearm; and

    2. the defendant did this intentionally or knowingly.

    Or

B. You must determine whether the state has proved, beyond a reasonable doubt, three elements. The elements are that—

    1. the defendant, in El Paso County, Texas, on or about October 30, 2014, committed an act clearly dangerous to human life to wit: shooting at Aaron Ochoa with a firearm;

    2. the defendant's act caused the death of Aaron Ochoa; and

10

3. the defendant intended to cause serious bodily injury.

***If any of you fail to agree*** the state has proved, beyond a reasonable doubt, both elements 1 and 2 of section A, or 1, 2, and 3 of section B listed above, ***you must find the defendant "Not Guilty"*** (VERDICT FORM A, at A.1). ***You must then proceed to deliberate regarding whether or not the defendant has committed the offense of manslaughter***.

If you all agree the state has proved, beyond a reasonable doubt, both elements 1 and 2 of section A, or 1, 2, and 3 of section B listed above, you must find the defendant "Guilty" (VERDICT FORM A, at A.2). You do not need to be unanimous with regards to whether the state has proven murder through section A or through section B.

If you find the defendant guilty of murder, notify the bailiff that you have reached a verdict.

**Manslaughter**

If you find the defendant "Not Guilty" of murder, you must then decide whether the defendant committed the offense of manslaughter.

. . .

(Emphasis added).

After its deliberations, the jury returned a verdict, finding Appellant guilty of the offense of murder. And he requested that the trial court poll the jury. Although eleven jurors affirmed that this was their verdict, one juror stated that this was not the juror's verdict. The trial court then directed the jury to continue in its deliberations, and it denied Appellant's motion for a mistrial. More than an hour later, the jury returned a verdict, again finding Appellant guilty of the offense of murder. When the trial court again polled the jury, each of the twelve jurors stated that Appellant was "guilty."

In *Barrios v. State*, the Texas Court of Criminal Appeals held that a jury charge, challenged by the defendant as requiring the jury to "unanimously agree that he was not guilty of capital murder before it could consider the lesser-included offense of robbery," was not given in error

11

because it actually "allowed the jury to consider the [entire] charge as a whole and . . . d[id] not require the jury to unanimously agree that [the] defendant [was] not guilty of the greater offense before considering [the] lesser-included offense." 283 S.W.3d 348, 350, 353 (Tex. Crim. App. 2009).

In *Barrios*, the trial court had instructed the jury:

> Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you ***will acquit*** the defendant of capital murder and next consider whether the defendant is guilty of robbery.

*Id*. at 349 (emphasis added). The trial court further instructed the jury:

> If you believe from the evidence beyond a reasonable doubt that the defendant is guilty of either capital murder on the one hand or robbery on the other hand, but you have a reasonable doubt as to which of said offenses he is guilty, then you must resolve that doubt in the defendant's favor and find him guilty of the lesser offense of robbery.

*Id*. at 350. Barrios argued that the first-quoted "sequencing instruction" required unanimity "because an acquittal is a verdict that requires unanimity." *Id*. at 351; s*ee* TEX. CODE CRIM. PROC. ANN. art. 37.07. And he asserted that the sequencing instruction, which required unanimity, and the second-quoted instruction on "benefit of the doubt" were "mutually exclusive." *Barrios*, 283 S.W.3d at 352. He noted that if "a defendant [was] acquitted under the sequencing instruction, then there [would be] nothing to compare the lesser-included offense to when subsequently considering the instruction on benefit of the doubt." *Id*. At that point, "[t]he disposition of the greater offense" has "already been decided" and "the instruction on benefit of the doubt thus becomes superfluous." *Id*.

The Court of Criminal Appeals explained that Barrios's construction of the trial court's charge was too "narrow." *Id*. It observed that juries make many decisions while in the jury room and they have discretion in deciding the method of discussion, juror speaking order, and the order

12

in which parts of the jury charge are considered. *Id.* Moreover, the purpose of article 37.07 is "to allow free discussion and interchange of opinions among jurors in order that proper verdicts may be rendered." *Id.* (quoting *Caesar v. State*, 135 Tex. Crim. 5, 117 S.W.2d 66, 68 (Tex. Crim. App. 1938)). The court also recognized that before a jury retires to deliberate or consider the issue of guilt on any offense set forth in a jury charge, the trial court reads to the jury the entire charge, including any instruction on the benefit of the doubt, and the jury may consider the evidence in the case in light of the entire charge read as a whole. *Id.* at 352–53. Thus:

> [E]ven if, and perhaps especially if, the jurors cannot agree as to guilt on the greater offense, they have already been instructed that they may consider guilt as to the lesser offense before deciding on a verdict as to the greater offense.

*Id.* at 353.

The court conceded that "[t]he inartful use of 'will acquit,' when the intended meaning [of the phrase] seems to be 'have a reasonable doubt of or cannot agree on guilt,' could perhaps confuse a jury[.]" *Id.* It noted, however, there was no indication that the phrase actually confused the jury, which found Barrios guilty of the greater offense. *Id.* The court suggested that the better practice may be for a trial court to include in its jury charge an instruction explicitly informing the jury that it may read the charge as a whole and substitute the words "or if you are unable to agree, you will next consider" for "you will acquit . . . and next consider" so that the charge makes clear that the jury has the discretion to "consider the lesser-included offenses before making a final decision as to the greater offense." *Id.*

In this case, as in *Barrios*, the trial court read the entire charge to the jury before the jury began its deliberations. Although the result of the first jury poll indicates that the jury was not initially unanimous, the jury, after continuing its deliberations, subsequently returned a unanimous guilty verdict, and it did so without any additional instruction from the trial court.

13

However, and more important, the complained-of instruction in this case expressly stated:

*If any of you fail to agree* the state has proved, beyond a reasonable doubt, both elements 1 and 2 of section A, or 1, 2, and 3 of section B listed above, *you must find the defendant "Not Guilty"* (VERDICT FORM A, at A.1). *You must then proceed to deliberate regarding whether or not the defendant has committed the offense of manslaughter*.

(Emphasis added). The trial court here avoided the "inartful" use of the phrase "will acquit." And its instruction to the jury, in contrast to the complained-of instruction in *Barrios*, and as expressly suggested as the better practice by the Texas Court of Criminal Appeals, clearly explained to the jury its duty to find Appellant "Not Guilty" if any one of the jurors did not agree that the State had met its burden of proof. Moreover, the instruction clearly explained to the jury that it would "then proceed to deliberate regarding whether or not the defendant has committed the offense of manslaughter."

Accordingly, we hold that the trial court's charge permitted the jury to consider the entire charge as a whole, did not foreclose the jury from first considering whether Appellant was guilty of the lesser offense of manslaughter, and did not require the jury to unanimously agree that he was not guilty of the greater offense of murder before it could consider whether he was guilty of manslaughter. *See id*. at 353. We overrule Appellant's first issue.

**"*Sudden Passion*"**

Appellant next asserts that the trial court erred in not instructing the jury on the issue of "sudden passion, adequate cause." He argues that the evidence establishes that he did not "premeditate to kill" the complainant because he testified that he only meant to "scare" him and shot him "in broad daylight, in front of numerous witnesses, in a public parking lot[.]" In regard to "adequate cause," Appellant asserts that the complainant's "constant taunting" and "the days and days of bullying" led him "to carry a firearm to the schoolyard brawl, in an attempt at scaring"

14

the complainant. And he argues that the complainant's "continued . . . bullying and taunt[ing]" in the parking lot, along with his "ordering Appellant to 'pop me,'" his "provocation," constituted adequate cause "[t]o a teenage boy[.]"

At the punishment stage of a trial on the offense of murder, "the defendant may raise the issue as to whether he caused the death" of a complainant "under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02(d). If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree. *Id.* "Adequate cause" is defined as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* at § 19.02(a)(1). "Sudden passion" is defined as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* at § 19.02(a)(2).

In *Wooten v. State*, the Texas Court of Criminal Appeals explained:

> The defendant has the burden of production and persuasion with respect to the issue of sudden passion. To justify a jury instruction on the issue of sudden passion at the punishment phase, the record must at least minimally support an inference: 1) that the defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment; 2) that his sudden passion was in fact induced by some provocation by the deceased or another acting with him, which provocation would commonly produce such a passion in a person of ordinary temper; 3) that he committed the murder before regaining his capacity for cool reflection; and 4) that a causal connection existed "between the provocation, passion, and homicide."

400 S.W.3d at 605 (footnotes omitted). The court further emphasized:

> It does not matter that the evidence supporting the submission of a sudden passion instruction may be weak, impeached, contradicted, or unbelievable. If the evidence thus raises the issue from any source, during either phase of trial, then the defendant has satisfied his burden of production, and the trial court must submit the issue in the jury charge—at least if the defendant requests it.

15

*Id.* (footnotes omitted). However, the evidence cannot be so weak, contested, or incredible that it could not support such a finding by a rational jury. *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). Thus, our duty is to examine the evidence supporting the inclusion of a charge of sudden passion, not the evidence refuting it. *Trevino v. State*, 100 S.W.3d 232, 239 (Tex. Crim. App. 2003).

We note that although Appellant, in his briefing to this Court, characterizes certain evidence as establishing that he "was the consistent subject" of the complainant's "bullying," none of the portions of the record cited by him supports this severe characterization of the complainant's behavior. Appellant during the guilt phase of trial, and his mother during the punishment phase of trial, did testify that he told her about his "problems" with the complainant and that they had met with the principal and Social Studies teacher to request that he be moved to another Social Studies class away from the complainant. However, Appellant himself testified that he and the complainant merely had problems that "young kids have . . . [a]lways arguing over stupid stuff" and "it ke[p]t getting worse[.]"

Appellant also testified that in the morning on the day that he killed the complainant, after the complainant had confronted him in their Social Studies class, he felt "panicked" about seeing the complainant and his friends in school throughout the day, and, thus, he did not attend the rest of his classes. However, Appellant presented no evidence that he felt "panicked" at the time he shot the complainant when he went to meet the complainant for an after-school fistfight.

Finally, in regard to Appellant's assertion that the complainant "taunted" him, Appellant, in his statement to Detective Sanchez, did note that in their Social Studies class in the morning on the day that Appellant killed the complainant, the complainant "kept bragging about [the] day that he thought [Appellant] was talking to him," "called [him] out," and raised his voice. He explained

16

that he "started like mad-dogging" the complainant because the complainant "started getting [Appellant] mad" by telling him, "Put your head down, put your head down." Appellant then responded, "We'll see what's up after school. . . . I need to go sit back down." And Appellant noted that he shot the complainant when the complainant "got close," saw the guns, and said, "Well, pop me. See if you're gonna pop me," or "Well, let me see you pop it[.]" Moreover, in court, Appellant testified that the complainant, in their Social Studies class, challenged him to a fistfight. He also testified that just before he shot the complainant, the complainant said, once in English, and once in Spanish, "[S]hoot me, . . . pussy."

Although there is evidence in the record that Appellant and the complainant had previous verbal encounters in school and met in a parking lot pursuant to an agreement to fight, sudden passion cannot be the result of former provocation; the passion must arise at the time of the offense. *See Hobson v. State*, 644 S.W.2d 473, 478 (Tex. Crim. App. 1983) (explaining passion "solely the result of former provocation" does not qualify). More important, there is no evidence that the complainant's words and so-called "taunting" produced a degree of anger, rage, resentment, or terror in Appellant sufficient to render his mind incapable of cool reflection, or that Appellant in fact acted under the immediate influence of such a passion. *See McKinney*, 179 S.W.3d at 570 (explaining complainant's actions of yelling at and pushing defendant did "not rise to the level of adequate cause" and "no evidence that the verbal taunting and physical pushing by [complainant] produced a degree of anger, rage, resentment, or terror in [defendant] sufficient to render his mind incapable of cool reflection"). Indeed, there is no evidence that any words uttered by the complainant in this case were sufficiently provocative to induce a sudden passion in Appellant or that such provocation would commonly produce such passion in a person of ordinary temper. *See Wooten*, 400 S.W.3d at 605. Thus, there is also no evidence that Appellant killed the

17

complainant before regaining a lost capacity for cool reflection. *See id.* And, for all these reasons, there is no evidence establishing a causal connection between a provocation by the complainant, Appellant's proclaimed sudden passion, and the Appellant's killing of the complainant. *See id.*

Accordingly, we hold that the trial court did not err in not instructing the jury on the issue of "sudden passion, adequate cause." We overrule Appellant's second issue.

## CONCLUSION

We affirm the judgment of the trial court.


TERRY JENNINGS, Senior Judge

February 7, 2020

Before Alley, C.J., Rodriguez, J., and Jennings, Senior Judge
Jennings, Senior Judge (Sitting by Assignment)

(Do Not Publish)